```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

CONSTELLATION ENERGY GROUP, INC.*
et al.
              Plaintiffs         *

       vs.                       *   CIVIL ACTION NO. MJG-00-2255

CLARK/BARDES, INC.               *
et al.
              Defendants         *

*      *      *      *      *      *      *      *      *
```

### MEMORANDUM AND ORDER RE: CLARK/BARDES, INC.

The Court has before it Defendant Clark/Bardes, Inc.'s Motion to Dismiss and the materials submitted by the parties relating thereto. The Court finds that a hearing is unnecessary to resolve this matter.

I.     BACKGROUND

Plaintiff Constellation Energy Group, Inc. ("Constellation") is a holding company whose subsidiaries include energy-related businesses such as Plaintiff Baltimore Gas and Electric Company[1]. In 1987, Constellation amended its Executive Benefit Plan and Group Life Insurance Plan to replace then-existing life insurance benefits with a coordinated life insurance program using individual life insurance policies employing a "split-dollar" premium arrangement. A split-dollar arrangement is a method of

---

[1] All Plaintiffs will be collectively referred to as "Constellation."



paying for a life insurance policy which allows the corporate employer to provide its executives with death benefits under a tax advantaged plan.  As alleged in the Amended Complaint, a split dollar life insurance plan is supposed to work as follows:

- Constellation paid a portion of an employee's annual life insurance premium.

- The employee's policy built up cash surrender value during the course of employment.

- If the employee died while employed, Constellation would be repaid its contribution from the death benefit (tax free to the employee).

- If the employee remained to retirement ("rollout") time, the employee would use the cash surrender value of the policy to repay Constellation its contribution and to buy post-rollout life insurance.

- The plan was to be operated so that the employee would be able to treat the receipt of the cash surrender value at rollout as a recovery of basis with any excess over the premiums paid by the employee recognized as taxable income.[2]

- The plan was to be operated to avoid treatment as a Modified Endowment Contract ("MEC") under § 7702A of the Internal Revenue Code subject to adverse tax consequences.  They include, for example, treatment of the receipt of the cash surrender value at rollout first as taxable

---

[2] For example, if a policy had $1,000,000 of premium accumulation of which $950,000 was paid by the employer and $50,000 paid by the employee with $800,000 of policy earnings then, on rollout, the payment of $950,000 to Constellation would be considered a non-taxable return of basis in the contract.

income.[3]

Amended Complaint ¶ 16.

In 1992, Constellation issued a request for proposal to various insurance brokers and administration service providers, including Defendant Clark/Bardes, Inc. ("CBI"), for purposes of obtaining and servicing new split-dollar life insurance policies. Constellation selected CBI, which represented that it had substantial expertise in the design, implementation and administration of split-dollar life insurance plans, to be its broker and administrator. Am. Compl. ¶ 15.

CBI recommended a split-dollar program under which Constellation's active eligible employees would surrender existing policies for universal life policies issued by Defendant New York Life Insurance and Annuity Corporation ("NY Life"). Constellation "relied upon CBI and New York Life for the selection and purchase of appropriate insurance products that would meet Constellation's well-known objectives." Id. ¶ 19. Chief among these objectives was "to provide each plan participant with a specified level of post-rollout life insurance and to allow each participant to reimburse Constellation the

---

[3] In the example in the foregoing footnote, the repayment of $950,000 to Constellation would be treated as taxable income to the employee to the extent of the $800,000 of policy earnings and only $150,000 would be treated as nontaxable return of basis in the contract.

total premiums paid for the participant," and "to avoid adverse tax consequences (i.e., status as 'modified endowment contracts' and 'forced out income.')"  Id. ¶ 14.

As a marketing tool, and to entice Constellation to use NY Life insurance policies to fund its split-dollar program, NY Life disseminated to Constellation and its broker, CBI, insurance illustrations and illustration software, free of charge.  The illustration software included testing for "adverse tax consequences" in the first year of the program, 1994.

In late March 1999, CBI advised Constellation for the first time that a number of policies were projected to have insufficient cash buildup at rollout, defeating the financial objectives of the program.  CBI advised Constellation that there was a failure to include MEC testing capabilities for any period of time after the initial year of the program.  As a result, Constellation will not attain the financial goals set forth in the Plans.  If Constellation were able to attain such goals, it would be at funding levels at which many of the policies would risk MEC status, substantially affecting the anticipated tax advantages of the program.

On July 21, 2000 Constellation filed the instant lawsuit against CBI, alleging the following causes of action:

        Count I:      Breach of Contract

>   Count II:       Professional Negligence (Program Design)
>
>   Count III:      Violation of section 404 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001 et seq.
>
>   Count IV:       Common Law Breach of Fiduciary Duty
>
>   Count V:        Breach of Contract (Post Program Design)
>
>   Count VI:       Professional Negligence (Post Program Design)
>
>   [Count VII:     Negligence claim against NY Life][4]

By the subject motion, CBI moves to have counts I-II and IV-VI of the Amended Complaint dismissed, asserting that the state law claims in these counts are preempted by ERISA.

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) is a means of testing the legal sufficiency of a complaint. "The question is whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the Complaint states any valid claim for relief." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 336 (2d ed. 1987). The Court, when deciding a motion to dismiss, must

---

[4]Constellation added this claim when it amended its Complaint on September 17, 2001.

consider well-pled allegations in a complaint as true and must construe those allegations in favor of the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Jenkins v. McKeithen, 395 U.S. 411, 421-22 (1969). The Court must further disregard the contrary allegations of the opposing party. See A.S. Abell Co. v. Chell, 412 F.2d 712, 715 (4th Cir. 1969). However, a complaint may be dismissed if the law does not support the conclusions argued, or where the facts alleged are not sufficient to support the claim presented.

III. DISCUSSION

Under the Supremacy Clause, U.S. Const., Art. VI, Congress may by statute expressly preempt state law. The Supreme Court addresses claims of preemption "with the starting presumption that Congress does not intend to supplant state law." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Company, 514 U.S. 645, 654 (1995). "This is especially true in cases involving fields of traditional state regulation, including common law tort liability." Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1467 (4th Cir. 1996). Therefore, bearing this presumption in mind, courts should first examine the text of the provision in question and then examine the structure and purpose of the Act as a whole. Travelers, 514 U.S. at 654.

Section 514(a) of ERISA contains an explicit preemption provision which provides, in pertinent part:

> Except as provided in subsection (b) of this section, the provisions of this Title and Title IV shall supercede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan.

29 U.S.C. § 1144(a).

The Supreme Court has interpreted the words "relate to" as words of limitation:

> If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course. . . . But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality.

Travelers, 514 U.S. at 654.

The Court explained that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw v. Delta Airlines, 463 U.S. 85, 96-97 (1983). In the instant case, the common law causes of action for breach of contract, professional negligence and breach of fiduciary duty cannot be said to "make reference to" ERISA in any manner. Therefore, this Court must determine whether such common law causes of action have a "connection with" ERISA for purposes of the instant motion.

7

However,

> For the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections. We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.

Travelers, 514 U.S. at 655.

The Supreme Court has found that in passing § 514(a) of ERISA, Congress intended

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . ., [and to prevent] the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990).

Therefore, in addressing the preemption question at issue in the instant case, the Court must bear in mind that "[t]he basic thrust of the pre-emption clause . . . was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." Travelers, 541 U.S. at 657. The Fourth Circuit has read Travelers to stand for the proposition that:

> . . . in light of the objectives of ERISA and its

8

> preemption clause, Congress intended ERISA to preempt at least three categories of state laws that can be said to have a connection with an ERISA plan. First, Congress intended ERISA to preempt state laws that "mandate[] employee benefit structures or their administration." Travelers, 514 U.S. at 658.
>
> . . .
>
> Second, Congress intended to preempt state laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan.
>
> . . .
>
> Third, in keeping with the purpose of ERISA's preemption clause, Congress intended to preempt "state laws providing alternate enforcement mechanisms" for employees to obtain ERISA plan benefits. Id.

Coyne, 98 F.3d at 1468.

It is clear that the common law causes of action for breach of contract, professional negligence and breach of fiduciary duty do not fit into any of the three categories above. Rather these causes of action are based on "'traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities.'" Id., quoting Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir. 1996).

Specifically, the Amended Complaint limits the non-ERISA claims to CBI's conduct "[t]o the extent that CBI was not acting as a fiduciary under ERISA." Am. Compl. ¶ 69. Constellation

states that "[t]he fact that CBI served as an ERISA fiduciary at one point does not mean that its conduct was not governed by state law at other points in time." Plaint. Opp. p. 25. State law claims against non-fiduciaries who provide services to plans are not preempted. See Sweeney, 89 F.3d at 1166-67. Therefore, Constellation makes the creative argument that unlawful conduct of an eventual ERISA fiduciary, committed before the party was subject to ERISA, is susceptible to common law causes of action. Although Constellation's contention appears to be somewhat novel, "courts should generally be reluctant to grant a motion to dismiss when the claim in question asserts a novel theory of recovery. Novel theories of recovery are best tested for legal sufficiency in light of actual, rather than alleged facts." Branch v. F.D.I.C., 825 F.Supp. 384, 397 (D.C.Mass. 1993).

Additionally, although the Court may need to examine Constellation's benefit plans in order to determine whether any state law causes of action have been established, such examination does not necessitate ERISA preemption. The Court's inquiry will be centered on whether CBI complied with the relevant state law standards. To illustrate:

> [A]n analogous situation is a hypothetical case of lawyer malpractice. Suppose that a client hires a lawyer to file suit, claiming that the client is entitled to benefits under an ERISA plan. The lawyer agrees, but then allows all the applicable

> limitations periods to run. If the client sues the
> lawyer for malpractice, then to prevail on the
> malpractice claim, he will likely have to prove
> the terms of his ERISA plan. However, the
> (professional malpractice) law at issue will have
> nothing to do with ERISA. The case will turn on
> legal duties generated outside the ERISA context,
> and the malpractice claim should not be preempted.

Coyne, 98 F.3d at 1472.

As with the hypothetical case of lawyer malpractice, Constellation's claims, although they may require the Court to examine some provisions of an ERISA plan, turn on common law. Therefore, this Court does not, at the current dismissal stage, find that the common law causes of action at issue "relate to any employee benefit plan" within the meaning of 29 U.S.C. § 1144(a). Accordingly, CBI is not now entitled to dismissal of counts I-II and IV-VI of the Amended Complaint.

IV. CONCLUSION

For the foregoing reasons:

1. Defendant Clark/Bardes, Inc.'s Motion to Dismiss the Amended Complaint is DENIED.

2. The case shall proceed pursuant to the Scheduling Order being issued on this date.

SO ORDERED this _19th_ day of March, 2002.

_____
Marvin J. Garbis
United States District Judge